STEPHEN R. KAHN (SBN 55789)
Attorney at Law
433 N. Camden Drive, Suite 888
Beverly Hills, California 90201
Telephone (310) 246-9227
Email: srklaw7@sbcglobal.net

DAVID W. DRATMAN (SBN 78764)
Attorney at Law
601 University Avenue, Suite 145
Sacramento, California 95825
Telephone (916) 443-2000
Email: dwdratman@aol.com

Attorney for Defendant
GABRIEL ALVA

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 2:21CR00178-JAM |
| Plaintiff, | ) | **DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS** |
| v. | ) | |
| GABRIEL ALVA, | ) | Date:  February 13, 2024 |
| Defendant. | ) | Time: 9:00 a.m. |
| | ) | Court: Hon. John A. Mendez |

Defendant GABRIEL ALVA, through counsel, hereby and herewith submits

his Sentencing Memorandum, with Exhibits.

///

///

///

///

///

///

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

1

Defendant reserves the opportunity to make additional comments at the sentencing hearing in this matter.

Date: February 7, 2024                    Respectfully submitted,


                              By    /s/Stephen R. Kahn
                                    STEPHEN R. KAHN


                              By    /s/David W. Dratman
                                    DAVID W. DRATMAN

                                    Attorneys for Defendant
                                    GABRIEL ALVA

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

# I.

## OVERVIEW AND RECOMMENDED SENTENCE

Defendant Gabriel Alva, age 31, has pleaded guilty to a two-count Information charging conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §§846 and 841(a)(1) (Count One), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. §924(c)(1)(A) (County Two).  Mr. Alva was arrested on May 16, 2019 and was released on a $75,000 unsecured bond on May 21, 2019.

This time frame of Gabriel Alva's involvement with internet drug sales spanned about one year, from approximately June of 2018 through May of 2019. Mr. Alva had long been personally dependent on drugs, dating back to his teen years. Before discovering the "dark web" and engaging in the activities that underlie this conspiracy, he had participated in small-time street sales of marijuana, cocaine and methamphetamine to pay for his own drug habit.

Gabriel Alva wishes to emphasize to this Court that he recognizes and fully acknowledges that his involvement in this drug conspiracy was inexcusable and completely wrong.  He has written a letter to the Court accepting responsibility and expressing remorse.  Though he was a drug user himself since his adolescence, Mr. Alva never received any form of meaningful treatment and was only able to become drug-free after being incarcerated on these charges.

In the nearly 5 years since his arrest, Mr. Alva has had ample time to reflect on the illegal and wrongheaded conduct that brings him before this Court.  He is committed to do whatever he can to make amends.  He made his intent to plead guilty to the prosecutors and agents early on.  His willingness to take responsibility augurs well for his rehabilitation and his ability to lead a law-abiding life going forward.

In arriving at an appropriate sentence, this Court is asked to weigh Mr. Alva's positive adjustment while incarcerated, as well as his "history and characteristics."

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

For these reasons, which will be addressed in greater detail in this memorandum and its attachments, it is submitted that a term of 114 months imprisonment would be "sufficient, but not greater than necessary" to effectuate justice and satisfy the sentencing criteria enumerated at 18 U.S.C. §3553(a).

## II.

## ACCEPTANCE OF RESPONSIBILITY

Literally within hours of his arrest, Mr. Alva advised defense counsel of his desire to accept full responsibility for this crime. His letter to the Court (attached as Exhibit A) reflects his contrition and states in part:

> First, I apologize and take responsibility for my crime and the harm I caused by selling drugs. I am aware of the damage created by drugs, both in society as a whole and in the personal lives of individual users and their families, because I have struggled with addiction myself since I was a teenager. Even after I was arrested and released on bond, as the pressure on me began to mount, I was not strong enough to resist the pull of using drugs and I relapsed. This resulted in my bond being revoked and coming back into custody. I take responsibility for that too, Your Honor. And I apologize to my mother and father, who are starting to deal with health challenges as they get older, and to everyone in my family for the heartache I have caused.
>
> I want to be very clear that I do not blame anyone but myself for the situation I am in. I did do the criminal acts I have pled guilty to, they were illegal and wrong, and there is no justification.

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

4

> Over and over I have reflected, what has brought me to this point? Simply put, drugs and my bad decisions surrounding drugs. It is difficult to put into words just how relentless the downward cycle of addiction can be....

Gabriel's Alva's commitment to making amends and rehabilitating himself has been noted by the members of his family, who have spoken with him by phone and visited him at the jail.

Gabriel's father David Alva comments in his attached letter (contained in attached Exhibit B):

> During the last almost 4 years that my son has been incarcerated, he and I have both been profoundly affected. Although painful to speak to my son on the phone or through glass, I absolutely see a profound change in his character, his demeanor and his peace of mind. I do believe my son is grateful that he was arrested. I don't think my son would be alive today had he not been arrested. I believe in him with my whole heart. I know who he is...and I believe he has the ability to help other young men with his experience.

Todd Duffy, a long-time family friend who has known Gabriel since he was born, notes in his letter (contained in attached Exhibit B):

> These court proceedings have undoubtedly taken a toll on Gabriel and his family. From our interactions and conversations, I can genuinely sense the remorse he feels and his strong desire to make amends. He often speaks of his aspirations for the future, particularly his wish to continue his education and contribute more actively to the community. I am aware of his significant growth in his

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

1  character during his time in custody, creating a deeper
2  understanding of his responsibilities and a mature outlook
3  on life.

4  Gabriel's positive outlook and mindset is further evident in his exemplary
5  inmate record during four years of pre-trial confinement. Not only has Gabriel had
6  no disciplinary problems of any type, he has distinguished himself as a helpful and
7  trusted inmate worker at each facility where he has been detained. At the Sacramento
8  County Jail, where Gabriel was confined for over three years, he was assigned to
9  assist the Sheriff's with intake and booking. There, he helped the deputies process
10  new inmates, providing them with clothing and helping fill out forms and paperwork.
11  He also was frequently called upon to serve as a translator for Spanish-speaking
12  inmates so that they could understand the deputies' instructions to them.

### III.

### A SENTENCE BEYOND 10 YEARS
### WOULD LEAD TO UNDUE DISPARITY

16  One of the core tenets of Federal sentencing is "the need to avoid unwarranted
17  sentencing disparities among defendants with similar records who have been found
18  guilty of similar conduct..." (18 U.S.C. §3553(a)(6)). A sentence in excess of 10
19  years imprisonment for Gabriel Alva would lead to undue disparity when juxtaposed
20  with the sentence imposed on the other principal defendant related to this case, Ian
21  Hoffmann.

22  Ian Hoffmann was the supplier of all of the drugs distributed in this
23  conspiracy , including those that were found in Mr. Alva's possession at the time of
24  his arrest. Mr. Hoffmann also had additional narcotics seized from his own home,
25  which were obtained by Mr. Hoffman. Ian Hoffmann is older than Gabriel Alva,
26  more seasoned and experienced, and he was far better-connected. Mr. Hoffmann had
27  sources and contacts within the Mexico-based drug supply organizations. In
28  contrast, Mr. Alva never had any supplier other than Ian Hoffmann.

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

Aside from being higher up in the drug distribution ladder, having been engaged in drug sales longer, being more sophisticated, and having been responsible for distributing far greater quantities overall than Mr. Alva, Ian Hoffmann also personally reaped greater financial reward. He made more money, led a more ostentatious lifestyle, acquired valuable real property, and had numerous other sellers to whom he distributed drugs in addition to Gabriel Alva. In every sense, Mr. Hoffmann was the dominant party in the relationship and Mr. Alva was subordinate to him.

Mr. Alva originally met and got to know Mr. Hoffmann at the gym where both of them worked out. Mr. Alva was around 18 years old and had developed a personal marijuana habit. He began buying marijuana from Ian Hoffmann, and as Mr. Alva's addictions evolved first to cocaine and later to methamphetamine, he obtained these drugs from Hoffmann as well. When the financial cost of Mr. Alva's addiction (up to $200 per day at its peak) compelled him to sell drugs to be able to afford to use them, Ian Hoffmann became Gabriel Alva's nearly exclusive supplier.

During the course of this dark web conspiracy and in prior years as well, Gabriel Alva rarely obtained a significant amount of drugs from anyone other than Hoffmann. There is virtually no way to measure the relative culpability of these two that leads to any conclusion other than that Hoffmann was the more culpable participant. In contrast to Ian Hoffmann, who had a minor criminal record, Gabriel Alva had no previous contacts with the law at all. One could perhaps point to the firearms as a distinguishing feature since Mr. Alva had more firearms in his residence than Mr. Hoffmann and plead guilty to a violation of 18 U.S.C. section 924(c). But even here, Mr. Hoffman was also in possession of firearms related to the narcotics in his house. In fact, both of the ghost guns found in Mr. Alva's apartment were supplied to him by Mr. Hoffmann.

Finally, Mr. Hoffmann was misleading in his sentencing papers to the Court when he suggested that he had:

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

> ...met an individual at the gym, Gabriel Alva...he
> eventually learned that Gabriel Alva was earning
> significant amounts of cryptocurrency by selling drugs on
> the dark web.  Ian Hoffmann learned how Mr. Alva's
> operation worked and imitated it.  He did so with the
> assistance of others because he lacked the computer skills
> to conduct the operation on his own...  (See Hoffman
> Sentencing Memorandum, Docket Entry 105, Page 9, line
> 23 to Page 10, line 1.)

It is true that Hoffmann and Alva originally met each other at the gym, but that had occurred years earlier.  In the interim, Hoffmann supplied Alva with drugs for his own personal use and small-time sales.  What Hoffmann fails to mention is that he originally suggested that Alva should explore drugs sales on the internet; and that all of the drugs distributed by both men were provided by Hoffmann, meaning that he Hoffman received profits from everything sold on the dark web by Gabriel Alva as well as by himself.

The nature of their relationship is accurately reflected in the Presentence Report (PSR) for Gabriel Alva at ¶29, which reads in part:

> ...Alva did state that Ian Hoffmann was his drug supplier.
> He indicated he was 18 years old when he met Hoffmann
> when Alva was working at the Woodland Hills Athletic
> Club.  Alva purchased a small amount of marijuana from
> Hoffmann for personal use and sales.  Alva said he then
> got into using and selling cocaine when he was
> approximately 24 years old, and Hoffmann supplied him
> that as well.  Alva said he tried to stop selling drugs, but he
> relapsed and began using and selling again.  When Alva
> was 25 years old, Hoffmann suggested selling drugs on the

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

dark web after Alva stated he indicated he was tired and
dissatisfied with his lifestyle.  Alva admitted he dedicated
his energy into the dark web drug market while he was
heavily using drugs, and he used the money to support his
own drug addiction.  Hoffmann began selling drugs on the
dark web, independent of Alva, after he saw how
successful Alva was.

Based on the foregoing, a sentence for Gabriel Alva greater than the one which
was imposed on Ian Hoffmann would represent unwarranted disparity.

## IV.

## DEFENDANT'S HISTORY AND PERSONAL CHARACTERISTICS
## SUPPORT THE REQUESTED SENTENCE

In Gall v. United States, 552 U.S. 38 (2007), the U.S. Supreme Court advised
that in addition to considering the Guidelines, the "district court should…consider
all the 3533(a) factors to determine whether they support the sentence requested by
a party… [The court] must make an individualized assessment based on the facts
presented." Gall at 596-597.

Furthermore, "'[i]t has been uniform and constant in the federal judicial
tradition for the sentencing judge to consider every convicted person as an
individual and every case as a unique study in the human failings that sometimes
mitigate, sometimes magnify, the crime and the punishment to ensue.'" Pepper v.
United States, 562 U.S. 476 (2011), quoting Koon v. United States, 518 U.S. 81,
113 (1996).  The Supreme Court has found that "[u]nderlying this tradition is the
principle that 'the punishment should fit the offender and not merely the crime.'"
Id. at 1240, quoting Williams v. People of the State of New York, 337 U.S. 241, 247
(1949).  The Supreme Court has "emphasized that [h]ighly relevant -- if not
essential -- to the selection of an appropriate sentence is the possession of the fullest
information possible concerning the defendant's life and characteristics."

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

9

The following social history information is presented in the spirit of 18 U.S.C. §3661 which sets forth, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

A.    Family Background and Upbringing

Gabriel Michael Alva was born on February 18, 1992 and raised in the San Fernando Valley section of Los Angeles. His father, David Alva, age 68, is a semi-retired hairstylist. David has worked in high-end hair salons for many years and has a devoted clientele. He is remarried to Victoria Alva, a woman who, like David, has grown children from her previous marriage. They live in Ventura County.

Gabriel's mother, Felicia Ritz, is 59. She has worked in interior design and as a make-up artist and sales rep for cosmetology companies. A few years ago Felicia moved to Alpharetta, Georgia, though she returns to California regularly to see her family members. Around two years ago, Felicia was diagnosed with a heart condition that necessitated surgical implantation of a defibrillator which her doctors have been monitoring.

Gabriel has one sibling, a younger sister named Savanna Alva. She is 27 years old and, like Gabriel, she struggles with substance abuse and depression.

Gabriel's grandparents immigrated from Mexico and the Dominican Republic. His paternal grandmother will turn 100 years old this month and lives in Los Angeles with Gabriel's aunt. Two of Gabriel's paternal aunts are attorneys. Susan Alva founded and directs one of the leading public interest immigration law firms in Los Angeles which provides *pro bono* legal services to immigrants and their families. Teresa Alva Rioux lives in the Chicago area, where she works for the State Public

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

Defender. She formerly was a Federal public defender, first in Los Angeles and then in Chicago.

Coming of age in the late 1960's, Gabriel's father was exposed to the counter-culture with its experimental attitudes towards drugs. In his teen years and twenties, he abused marijuana, hallucinogens, alcohol and cocaine. Despite his addictions, David had a strong work ethic and was very successful in the hair styling profession. Before the age of 30, he was able to purchase a suburban home in a comfortable middle-class neighborhood of the San Fernando Valley.

David Alva and Felicia Ritz met when he noticed her working behind the make-up counter at a department store. They married in the late 1980's; he was 32 and she was 23.

After his parents married, Gabriel's mother Felicia was mostly a full-time homemaker. She would drop the children off at school, pick them up in the afternoon, make sure that they did their homework, and prepare their meals. She was active in parent groups and attended her children's extracurricular activities.

According to his parents, Gabriel did well scholastically in his elementary and middle school years and earned solid grades. In addition to sports, he became very interested in music, learning to play piano as well as the drums. In high school, he was in the concert band, the jazz band and the marching band, where he dressed up in a uniform and performed at football games, playing the snare drum.

Though David worked long hours, often scheduling appointments on evenings or weekends, he also dedicated time to his children. He enjoyed sports and father-son type activities with Gabriel, such as long distance bicycle racing which was a passion of David. Gabriel began accompanying his father at an early age, and was always welcome to ride with David and his adult cycling partners since he could keep up with them and had a mature attitude for his age.

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

11

Mark Knudsen, a building contractor who met David Alva 30 years ago through their membership in the same bicycle racing club, recalls in his letter (attached in Exhibit B):

> I remember David and his wife bringing little Gabe in his car seat to bicycle banquets.  ... I remember they were so close.  We would go on early 6:00 am rides for 2-3 hours and little Gabe would come along.  He was quite the athlete as a teenager.  He was very successful at the local and state levels in racing.  I remember seeing him at high school football games marching with the band.  He was a respectful great young man.

David Alva recounts:

> He became an accomplished musician, he could play piano, guitar and drums, he played in the school marching band and jazz band then started a rock band.  I was the proudest father, way more than I could ask for....
>
> Gabriel was also a national level cyclist.  By age 12, he had won three national medals in Utah, and never once cared to look at the trophies he had won.  His humility was profound.  He was never comfortable with me talking about him and his accomplishments.  Gabriel always had an altruistic outlook, even in bike racing with the team where he was clearly the strongest in the team.  He never cared about winning as much as he cared that all his teammates were part of it.  When my son was 13 and in a race that was one of the biggest races of the year, Gabriel and his teammate were both in the lead, and as it came to

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

the finish line, Gabriel let up simply to let his friend Eric
win because Eric hadn't won a race all year.  Without
thinking I said something to my son about not winning, he
looked at me and said "winning means more to Eric than it
does to me."

Susan Alva, Gabriel's aunt, remembers in her letter (attached in Exhibit B):

Throughout Gabe's childhood, he would spend weekends
with me and my then-husband regularly.  He was a joy to
be with and enjoyed being exposed to different
surroundings and experiences (he was raised in suburban
Woodland Hills; I live in mid-city Los Angeles).  He was
always curious, open, eager to learn, excited by everything
he saw.  I can still picture him hanging out the car window
as I'd drive him through downtown, just soaking it all in.
This is also when I first saw his kind heart and empathy.
In spite of being raised in somewhat affluent and protected
surroundings, his immediate reaction to seeing a homeless
person's outstretched hand was to give something....


What was (and still is) amazing about him is that whatever
he tried, he did exceptionally well.  When he and his father
shared a passion for biking, Gabe qualified as a
competitive racer.  When he took up the drums, I
remember taking him and his bandmates to record in a
studio and overhearing the technicians comment how good
he was.

Fairly early in their marriage, David Alva had begun participating in 12-Step
Alcoholics Anonymous (AA) meetings to achieve and maintain sobriety.

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

13

Nevertheless, there were serious interpersonal problems in the relationship between Gabriel's parents. As their arguing and conflict intensified and moved into the open, it became evident that the marriage was unraveling. Felicia moved out and Gabriel moved with her to a new place, while David stayed in the family home with Savanna. Gabriel absorbed and internalized many of his mother's aggrieved feelings towards his father. He held his father responsible for the break-up and became estranged from the person who had been his role model. Gabriel stopped bicycle racing, quit the band, and left his drums and other musical instruments behind at his dad's home so he could no longer practice.

David Alva acknowledges in his letter:

> Gabriel's senior year of high school was a shift. When Gabriel was 14, his mother and I filed for divorce, and although we did our best at being civilized and loving, it took a tremendous toll on my son. He was older and incredibly sensitive. My son loves his mother deeply, and I think he became the self-imposed man of the house, which I never wished on that young man. There was a shift in him and for that I will always feel pain.

In the bitterness of his parents' divorce, Gabriel got derailed. He had always been seen within the family as college-bound, possibly to a music school -- but other than a few brief attempts at community college, he never followed through with it. His aunt Susan Alva writes:

> It was during Gabe's teen years that his parent's marriage began to falter and this had a deep impact on Gabe's life and spirit. I feel one of the biggest hits was Gabe not going on to college. During his last year of high school, I took him on several trips to see colleges, including San Francisco and Boston. He was excited and had his parents

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

1  support but that disappeared as his parents' marriage

2  ended.

3

4  I've always seen this as a critical moment in Gabe's life

5  and his seeming to flounder after high school. I'm

6  ashamed to say that I did not realize until now how heavy

7  his drug use was during this time.

8  B.    Education and Employment

9  After graduating from El Camino High School in 2010, Gabriel enrolled in

10  Moorpark Community College which was about a 40-minute drive from his home.

11  He says he wanted to try to get a fresh start away from the people he had gone to high

12  school with so he sought out a new environment. He went there for a time but soon

13  stopped attending. Later, he tried to go to the University of Phoenix but by that point

14  he was so deeply immersed in drug use that his attendance was inconsistent.

15  Despite the seriousness of his addiction, Gabriel displayed a healthy work

16  ethic. Right out of high school, he found employment at the Calabasas County Club

17  as a golf cart attendant. Not long after, he was hired at the Woodland Hills Athletic

18  Club, initially selling gym memberships and then working his way up to shift

19  manager where he was responsible for everything that happened in the gym on his

20  shift.[1] Gabriel enjoyed that environment because he could observe serious

21  bodybuilders and learn everything he wanted to know about working out. He held

22  these jobs for a couple of years.

23  One of the people who Gabriel got to know at the gym was a real estate broker

24  who noted Gabriel's commitment to his job and encouraged him to consider a real

25  estate career. At this man's urging, Gabriel studied for and obtained his real estate

26  license when he was just 19 years old. After that, however, he found there was not

27

28  [1] It is there that he met Ian Hoffmann, co-defendant in the related case who
became Gabriel's drug supplier.

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

15

much he could do with the license, since prospective home buyers looking to make the biggest financial investment of their lives wanted to deal with an older and more experienced person.

Gabriel's next career was as a security professional.  He obtained a guard card and was always able to work regularly in this field.  The fact that he was a weightlifter who was in good shape physically added to his employability.  Often, he was offered the better-paying positions at nightclubs and entertainment venues in the Hollywood and West Hollywood area.

A reflection of Gabriel's industrious nature is contained in the letter (attached in Exhibit B) from Angela Dunson, Manager of the Lowe's store in Lilburn, Georgia where Gabriel was employed for about six months following his arrest on these charges and before his bond was revoked.  She states:

> Mr. Alva was well liked and greatly appreciated by
> Leadership and his peers.  He was a team player assisting
> store associates and customers in various aspects.
> Understanding challenges with labor, hours, and staffing,
> Gabriel worked beyond scheduled hours and came in on
> his off days to assist with projects and tasks falling outside
> of his job duties....  Our receiving department was a
> cesspool of trash, damaged products, returns and incoming
> unorganized freight. Gabriel cleaned and organized
> receiving.  ...Gabriel consistently worked in a manner to
> improve process, approached responsibility with
> intelligence and thought outside the box to make the job
> easier.  He was a store associate discussed at a District
> level for his overall contributions.

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

Ms. Dunson continues in her letter:

> It was obvious Gabriel wore an ankle monitor.  Upon his
> hire, he was honest about his past and challenges with drug
> addiction.  ...he was an easy target for ridicule, jokes and
> doubt.  He was asked to do things no one else wanted to do
> yet he never allowed this to bother him or impact his
> performance.  He showed up each and every day and
> outworked any and everyone.  In time he became well
> respected by all.  He assisted elderly coworkers with
> projects in their home.  He also went above and beyond to
> resolve customer complaints by delivering failed deliveries
> to them.  As a Leader he was the employee you depended
> upon.  Store associates were sadden to learn of his
> unexpected departure as again Gabriel had proven to be a
> very valuable asset to our store and a helpful teammate.

C.    Substance Abuse History

As noted in the Presentence Report (see PSR, ¶¶65-72), Gabriel was a chronic substance abuser for nearly 10 years, from his final year of high school until his arrest on the instant charge.  His use progressed from marijuana, to pills (chiefly benzodiazepines, such as Xanax), to cocaine, to methamphetamine.  One after the other, he was only able to quit one addicting drug by becoming hooked on a new, even more powerfully addictive substance.  As noted, the onset of Gabriel's initiation to drug use followed on the heels of the break-up of his parents' marriage.  Gabriel writes in his letter to the Court:

> ...This happened as I was making the transition from junior
> high to high school, which was around the same time some
> of my friends were beginning to experiment with
> marijuana, pills, and other drugs.  I experimented along

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

17

with them, soon finding myself on the long descent into
addiction and nothing in my life has been the same after
that.

I believe my drug use initially started as a form of
escapism, as a coping mechanism.  It evolved into a
chaotic and toxic path to self-destruction.  I was stuck in a
defeatist mentality, trapped in a downward spiral.  I was
caught in a free fall, never realizing just how lost or how
disillusioned I had become.  If I was stronger back then --
if I was then who I believe I am now -- then I would have
fought my way back to the surface, I would have risen
above and my life would be very different.  Unfortunately,
I was not that person then and I rationalized my choices as
being my only option, as though being a drug user was all I
would ever amount to or be good for.

In the 3 to 4 years prior to his arrest, Gabriel developed an extremely heavy
stimulant addiction, first to cocaine and then to methamphetamine.  It overwhelmed
all facets of his thought processes, emotions and judgment.  At the end stage of his
meth addiction, prior to his arrest, he recalls never sleeping for more than 30 minutes
to an hour at a time, and never laying down on a mattress or in a bed.  His only sleep
consisted of naps while sitting in a chair for brief periods, after which he would wake
with a bolt.  He had to discipline and practically force himself to eat because the drug
took away his appetite.  He withdrew from all of his former close relationships and
saw little of his family or friends during this period.  As summarized in the
Presentence Report:

68.    *Cocaine*:  The defendant reported he began using and
selling cocaine at age 22 or 23.  He said he used Hoffmann

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

18

as his primary source for cocaine beginning when he was
24 years old.  The defendant said he purchased an ounce of
cocaine, multiple times weekly.

69.  *Methamphetamine*:  The defendant stated that his primary
drug of choice was methamphetamine between age 25 and
27.  He stated he used up to 7 grams daily and was
supplied methamphetamine from Hoffmann....

71.  The defendant reported his drug use affected his ability to
focus and retain information in college.  He stated he was
incoherent at times and eventually stopped attending
school because he was so dependent on drugs. He
estimated that his drug use cost him approximately
$200.00 daily.  He said he experienced extreme financial
pressure and isolation from his family.  The defendant said
he used drugs to cope with daily life challenges and he
became overwhelmed by "everyday stresses."  He stated,
"My sense of self-worth and purpose slowly became
relative to the selling of and using of drugs.  With drugs, I
was despondent, in my own warped reality, irrational in
judgment yet completely rational in my own mind.
Without [drugs], I was lost, easily overwhelmed and under
stimulated, fatigued and reclusive."

When Gabriel was released on bond in May of 2019, he thought that he would
be able to avoid using drugs.  But under all the stress and uncertainty of what was
going to become of his life, aware that he was facing years in prison, he buckled
under the pressure.  Only a few months removed from having been a heavy
methamphetamine user, he reached out to what was familiar to calm his anxiety and
help him function, and he relapsed.

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

19

## V.

## POST-OFFENSE ADJUSTMENT

Gabriel has been back in custody for 4 years now. He has done exceptionally well inside the jail. He was a trustee at Sacramento County Jail who was utilized by deputies to help with the booking and orientation process of new arrestees. He would work hours at a time alongside the deputies, assisting with paperwork, issuing clothes to the new inmates, etc. He got along very well with the deputies and identified with them. He was well-liked and respected by the deputies.

Gabriel has also gotten along well with his fellow inmates. He has made the best of his time, reading voraciously. He has continued working out and maintains good physical condition. He has avoided disciplinary infractions or write-ups, and he has used the time to reflect and mature as a person.

In her letter, Felicia Ritz comments regarding her son:

> Your honor, my honest opinion is this happened in the nick
> of time. I consider us lucky not to have lost him to an
> overdose, he will say the same....
>
> Since his incarceration, we have all seen a major change in
> him. Yes, a "model prisoner" you could say. At one point
> holding down two jobs, because both the Kitchen Dept.
> and Booking Dept. both wanted him on staff. Well liked
> by deputies, staff just further proof, he is a respectful,
> responsible man when not under the influence of drugs.

Gabriel states in his letter to the Court:

> I now look at my life and the world much differently. This
> experience of over 4 years of jail, as hellish and miserable
> as it may sometimes be, has been enlightening. I look
> back with disgust, shame, and regret at who I used to be,

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

who I allowed myself to become.  Regardless of what led
me down those dark roads, regardless of circumstances,
there is no more trying to rationalize actions for which
there can be no excuse.  As clouded as my judgment
became, as skewed as my logic was, my past, my present,
and my future are all the result of my own poor decisions.
There is no doubt in my mind that this experience was
absolutely necessary for me.  It took incarceration to break
me down to my most basic self.  It has humbled me.  It has
forced me to reflect on my past, acknowledge what needs
to be left in the past, and to rebuild around sounder ideals
and habits that will hopefully enable a fulfilling life....

Sir, I have chosen to maximize this opportunity to learn
from my failures and my mistakes, gaining a lifetime
worth of insight in the process.  I have worked alongside
the deputies in the jail as a trusty, helping them with the
intake and booking of other inmates.  I have read more
than one hundred books while I have been in jail, far more
than I had ever read in the rest of my life combined.  I have
learned to speak Spanish here which, although it was the
language of my grandparents, I had never been
comfortable conversing in before.  Most important, I have
learned patience and to accept that there are things I cannot
control....

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

# VI.

## LETTERS OF SUPPORT

The attached letters in Exhibit B attest to Gabriel Alva's remorse, his commitment to change and rehabilitate, his closeness to his family, and his considerable potential.  A few are excerpted below.

Todd Duffy, the co-worker and friend of David Alva who has known Gabriel since he was born, writes:

> Gabriel was always a very kind and considerate young man.  I have always known him to be self reflective. Whether he was competing at the national level in bicycle racing or studying to better himself he would always give his all....
>
> I am aware that Gabriel has faced challenges in his life, particularly his battle with drug dependency.  I know that dependency has had a profound effect on others as well. However, the person I've come to know has always shown a sincere desire to overcome these challenges and be a positive influence on his family and friends and community.  His dedication to recovery and his commitment to setting a right example has always been commendable.  My hope is that he will continue to be able to help others through sharing his journey.  Gabriel has a tremendous heart, will and determination that I am confident will drive him to helping numerous people going forward.

Angela Dunson, Gabriel's former job supervisor at Lowe's who has stayed in communication with his family, comments:

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

It is with great hope of freedom from drug addiction and further incarceration that I write this letter on behalf of Mr. Alva....  For everything good, his drug addiction had always brought him to rock bottom.  He was clearly able to see how his associations and prior choices in life had led him down a dark path.  While working for Lowe's, Gabriel was filled with a desire for opportunities he had not deemed possible for himself.  Lowe's is a company which invests in veterans and those in need of a second chance.... I continue to see signs of growth during the past couple years he has been in custody.  He maintains a work life as a trustee and understands he has options after incarceration.  He further admits incarceration has provided a much-needed rehabilitation from drugs which otherwise might not have occurred....  I sincerely believe Gabriel is remorseful for past transgressions and pray time served, demonstration of his capabilities, maturity has earned compassion in sentencing.

Mark Knudsen, the building contractor who met Gabriel and his father through bicycle racing, observes:

Divorce is not at all beneficial to children.  I believe Gabe looked for and found a way to escape from the reality of what was and what happened to his family.  I remember his sister living with her father and Gabe living with their mother.  It was a mess for them.  In my heart I truly believe that Gabe should be held accountable for his actions as an adult but the ground work for failure was already written for him as a teenager.  I know he has spent

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

the last 4 years of his life incarcerated and could spend a
whole lot of years longer.  I believe with the proper
stipulations in place such as mandatory alcohol and drug
testing as well as visits by probation department officials
to his work and living quarters, after his release this young
man will turn his life around in society and become a
responsible citizen and possibly have a family of his own
one day.  If he is released and comes back to Southern
California I will provide employment for this young man
and send monthly progress reports to the court about his
employment.  You have my word your honor…

Gabriel's father David Alva states:

For the last decade, my relationship with my son has been
difficult and we have had obstacles.  Although I am sober,
regardless of my efforts I could not stop the power of
addiction in my home.  Just as many other families suffer
from the same problems that I have in my home, my son's
addiction grew as did my depression, my hopelessness and
my inability to make a difference.  Walking through this
experience, watching my son get arrested, has done nothing
short of breaking my heart....  I think my son lost sight of
who he was and he was consumed by making it being
successful, the almighty pursuit of happiness that we all talk
about.  He went about it in all the wrong ways.

Everyone in Gabriel's family has been broken through this
experience.  I have not gone through a harder period of time
in my life, watching my son.  I absolutely support a drug

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

rehabilitation program for him....  Please give this young

man the opportunity to live a better life and for me his

father, to be able to be with my son again before I leave this

earth.

And his mother Felicia Ritz closes her letter with the hope she will be able to

reunite and enjoy more years with her son:

...I was told by my Cardiologist that I have heart disease,

my heart at that point was pumping at 40% of its

capacity.  ...after an Angiogram, I was told my arteries were

completely clear, but my heart had dropped to 25% of its

capacity.  My Cardiologist, Dr. Leo Polosajian (in L.A.)

said I was lucky not to have had a heart attack yet, as I

would not have survived it.  He fast tracked an approval for

an implanted Defibrillator device....  I ask that you consider

this in the sentencing phase.  Nothing would give me more

peace than knowing Gabe has started the second chance at a

good life at my home in Ga.  Thank you for your time,

consideration in changing the direction of Gabe's life!

## VII.

## THE COURT'S AUTHORITY TO IMPOSE A NON-GUIDELINES
## SENTENCE IS FIRMLY ESTABLISHED UNDER
## THE CURRENT STATE LAW

Under the principles set forth in <u>United States v. Booker</u>, 543 U.S. 220 (2005),

the Federal Sentencing Guidelines are purely advisory.  The guidelines are now just

one among a number of factors that sentencing courts are meant to assess in

imposing a sentence that is "sufficient, but not greater than necessary" to achieve the

purposes of sentencing set forth in 18 U.S.C. §3553(a)(2).  The purposes include

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

retribution, deterrence, incapacitation, rehabilitation and avoidance of undue disparity.

Numerous appellate decisions have clarified the role and approach of the sentencing court post-Booker.  The Ninth Circuit has found that "Booker empowered district courts, not appellate courts…[and] breathe[d] life into the authority of district court judges to engage in individualized sentencing." United States v. Whitehead, 532 F.3d 991, 993 (9th Cir. 2008).  And the Seventh Circuit has stated that post-Rita "[t]he district courts must calculate the advisory sentencing guideline range accurately, so that they can derive whatever insight the guidelines have to offer, but ultimately they must sentence based on 18 U.S.C. §3553(a) without any thumb on the scale favoring a guideline sentence." United States v. Sachsenmaier, 491 F.3d 680, 685 (7th Cir. 2007).

The sentencing range in this case highlights the importance of the Supreme Court's ruling in Booker that the guidelines be viewed as merely advisory.  A sentencing court's authority "to reject…the advice of the guidelines," Kimbrough v. United States, 128 S.Ct. 577 (Scalia, J., concurring), has particular relevance here. The drug table at U.S.S.G. §2D1.1(c) can be a blunt instrument ill-suited to the wide range of crimes to which it applies.  Moreover, "the guidelines' fetish with abstract arithmetic" fails to consider the devastating effect "that guideline calculations can visit on human beings if not cabined by common sense." United States v. Adelson, 441 F.Supp. 2d 506, 512 (S.D.N.Y. 2006).

The sentencing considerations set forth at 18 U.S.C. §3553(a)(2) support the requested term of 114 months incarceration.  These factors will each be discussed briefly as they apply to Gabriel Alva.

A.    Just Punishment

Mr. Alva has committed a serious Federal drug offense that he will regret for years to come and for which the law requires "just desserts."  The requested term of

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

114 months of imprisonment represents tangible retribution that will adequately promote respect for the Federal narcotics and firearms laws.

It is notable that the first 4 years of Mr. Alva's incarceration have been served in local, pre-trial confinement -- which by its nature is more onerous and stressful than serving time in a BOP facility for sentenced prisoners with better employment and educational opportunities and recreational programming.  Over half of Mr. Alva's time in pre-trial confinement overlapped with the COVID-19 quarantines and lockdowns, thus restricting or eliminating normal visitation and programming and overall creating a far more punitive form of custody.  Mr. Alva will also face all of the barriers, impediments and stigma of being a convicted Federal felon.

Finally, due to the firearms charge to which he pled guilty, Mr. Alva will be barred from any relief in the form of earned early-release credits under either RDAP or the First Step Act (FSA).  He is similarly ineligible for the Zero-Point Offender 2-level guideline reduction under U.S.S.G. §4C1.1 (Amendment 821, enacted on November 1, 2023), though he has no criminal history points.  Simply put, he will serve fully 85% of whatever sentence is imposed.

B.    Deterrence

The need for adequate deterrence includes both specific (individual) and general (societal) deterrence.  Given Mr. Alva's contrition, along with the fact that he has done so well during the four years he has served in pre-trial custody, the requested 114 months of imprisonment is sufficient to deter him from again breaking the law.

From the standpoint of general deterrence, any individual who might have been tempted to participate in a drug conspiracy would think again upon seeing that it could result in a 114 month prison term.

C.    Incapacitation/Public Safety

A 114-month term of imprisonment is more than enough to protect the public from misconduct by this defendant.  Mr. Alva has a proven work ethic and a strong

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

family support network to ensure that he does not revert to similar illegal behavior again.  Moreover, he is thoroughly committed to undergoing sustained, intensive drug abuse treatment so that he is equipped to live the rest of his life sober and drug-free.  In Mr. Alva's case, his involvement in drug sales was a direct outgrowth of his own crippling addiction to stimulants.  There is no compelling rationale to imprison Mr. Alva beyond the term of 114 months for purposes of public safety or societal protection.

D.    Rehabilitation/Correctional Treatment

While in prison, Mr. Alva has been working hard at self-rehabilitation during the 4 years he has already been incarcerated.  He has been steadily employed in the jail − for a time holding two separate jobs − and has read more than one hundred books.  He has learned to speak Spanish.  And he has compiled an exemplary inmate record, with overwhelmingly positive work evaluations and no disciplinary infractions of any type.  Throughout his time at the local facilities where he has been detained, he has sought to align himself with the most positive elements among the inmate population on his floor.  He has stated his intention of continuing to do the same once he is transferred to a Federal BOP facility.  He has helped jail staff to quell problems when they have arisen and has been a stabilizing presence.

In the BOP, Mr. Alva will have a chance to take vocational training courses, perhaps some college correspondence classes, and other programs geared toward self-improvement.  He will also be eligible to enroll in the RDAP course, though he will not qualify for its early release component.  The maximum benefit from these ameliorative programs can, in any event, certainly be internalized by Mr. Alva within the requested term of 114 months.  A longer period of confinement is not needed from the standpoint of his personal rehabilitation.

E.    Avoidance of Unwarranted Sentence Disparity

18 U.S.C. § 3553(a)(6) references the need to avoid unwarranted sentencing disparities.  For an offender such as Gabriel Alva, a prison sentence of 114 months

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS

28

for this offense would not represent undue disparity in favor of the defendant. Quite the opposite, a sentence in excess of 10 years would be unjustifiably disparate with the sentence imposed on related defendant Ian Hoffman, who was involved with serious drug trafficking much longer than Mr. Alva, at a higher rung in the supply chain, and was, in fact, the source of all of the drugs distributed by Mr. Alva in this conspiracy.

## VIII.

## CONCLUSION

Defendant Gabriel Alva is highly remorseful. He acknowledges the harmfulness of his illegal actions. He comprehends that his involvement in this case is serious and requires punishment. He deeply regrets not only his crimes, but also the years of his life he squandered to mindless drug addiction and the heartache he caused his family. He took concrete steps at a very early juncture of this case to accept personal responsibility and mitigate the damage he had caused.

On the grounds set forth herein, Defendant Gabriel Alva, through counsel, respectfully requests that the Court impose a sentence of 114 months. Such a sentence would recognize the totality of extenuating circumstances present in this case, while being "sufficient, but not greater than necessary" to effectuate justice, to comply with the sentencing factors set forth at 18 U.S.C.§3553(a), and to punish, deter, incapacitate and rehabilitate this repentant and still maturing individual.

Date: February 7, 2024                    Respectfully submitted,


By    /s/Stephen R. Kahn
          STEPHEN R. KAHN


By    /s/David W. Dratman
          DAVID W. DRATMAN

          Attorneys for Defendant
          GABRIEL ALVA

DEFENDANT'S SENTENCING MEMORANDUM, WITH EXHIBITS